# Richmond.

## LOFTUS v. MALONEY.

### January 26th, 1893.

1. CONTRACTS—*Intoxication*—*Case at bar.*—To render a contract voidable on the ground of intoxication, the party setting up such a defense must have had his mental faculties so impaired thereby as to render him *non compos mentis* for the time being; and, in the case here, the evidence not only does not show that the complainant was intoxicated to such an extent, but, on the contrary, shows that he was sober and his faculties unimpaired.

HELD:

  No error in dissolving the injunction to the enforcement of the contract in controversy.

2. CHANCERY PRACTICE.—An issue out of chancery is not allowable except to aid and satisfy the chancellor in cases where the evidence is so conflicting as to make him doubt what his decision should be.

3. UNCONSCIONABLE BARGAINS.—Where the evidence shows that the property sold yields from 12 to 22 per cent. annually in rent—

HELD:

  The purchase could not be considered the result of an unconscionable bargain.

Appeal from decree of the hustings court of the city of Norfolk, rendered June 23d, 1891, in a chancery cause wherein M. W. Loftus was complainant and James M. Maloney was defendant.

This was a suit in equity, brought in the circuit court of Warwick county, by M. W. Loftus, plaintiff, against J. M. Maloney, defendant, to enjoin and restrain said Maloney from disposing of or assigning certain purchase-money notes executed to him by said Loftus for the purchase-price of certain real and personal property sold by said Maloney to said Loftus, and further to enjoin said Maloney from further prose-

cuting a certain action at law then pending in the circuit court of said county in the name of said Maloney, plaintiff, against said Loftus, defendant, and to set aside and annul the contract of sale evidenced by said notes and by a certain deed of trust to secure the same, executed July 21st, 1890, by said Loftus to W. J. Nelms, trustee, to secure to said Maloney the payment of said notes.

The material facts are these: About one year prior to the institution of this suit, M. W. Loftus, the plaintiff therein, came to Newport News, purchased a lot in that town, erected thereon a bakery, and commenced business. Thereafter—to-wit, in the month of May, 1890—J. M. Maloney came to Newport News. Both Loftus and Maloney came from the state of Pennsylvania, where the latter had lived with the former for ten years, and knew him well. After Maloney came to Newport News, he and Loftus entered into a co-partnership, under the firm-name and style of Loftus & Maloney, for the purpose of carrying on the business of keeping a bar or saloon for the sale of liquors, &c.; and each of the partners were to put into the firm $1,350, and to share equally in the profits. Maloney, according to the partnership agreement, put in his $1,350, but Loftus put in only $1,000. The firm of Loftus & Maloney then proceeded to erect, on the Loftus lot aforesaid, a large building, at the cost of about $1,800, in which to conduct their said business; and, when the building was partially completed, furnished it and put therein a stock of wines, liquors, tobacco, cigars, &c., at a cost of about $1,500, which was principally bought on credit, and remained unpaid for when Maloney afterwards sold out his interest in said concern to said Loftus.

The firm of Loftus & Maloney being thus constituted and having commenced business, Maloney went on a visit to his former home in the state of Pennsylvania, and about the 30th day of June, 1890, returned to Newport News, with his

family, and took up his abode in the said house of Loftus & Maloney.

In his bill, after setting forth substantially the facts above stated, Loftus charges that from the time said Maloney returned to Newport News, he, well knowing the habits of said Loftus, used all inducements in his power to get said Loftus to drink ardent spirits and to keep him drunk; that within two or three days after said Maloney returned to Newport News he told Loftus that the partnership must be dissolved; that Loftus then offered to pay Maloney the amount he had put in the partnership, which proposition was declined by Maloney; that the said Maloney, from that time until his object was accomplished, kept said Loftus under the influence of ardent spirits, irritated, annoyed, and excited him until he was deprived of his reason and an agreeing mind, and was wholly unable to comprehend the nature of his own acts; that on the 21st day of July, 1890, after keeping said Loftus in this state of drunkenness and excitement for three weeks, Maloney induced him to enter into a contract, by which said Maloney was to receive the sum of $2,750 for his interest in said partnership, and said Loftus assuming the payment of all the debts of said firm, aggregating over $1,500, and to keep the property insured for $2,000; and also induced Loftus to execute a deed of trust on the whole property, real and personal, to secure the payment of said debt, a copy of said deed being exhibited with and as part of said bill, marked " A."

The bill alleges further that said firm of Loftus & Maloney had been in business less than two months prior to the purchase by Loftus of Maloney's said interest, and that there was no special advantage, either in the location or the nature of the business, to make it especially or peculiarly profitable, it being in the immediate vicinity of six other bar-rooms.

The bill further sets forth that as soon as Maloney had secured the deed aforesaid, he, with his family, left the house,

taking with him a good deal of the personal property which belonged to the firm of Loftus & Maloney, and has since col-lected some of the outstanding debts due said firm, and told his friends that he would be back in the house in a short time, when it would be his own property.

The bill then sets forth " that the value of the stock on hand now is about $500; that said contract was unconscion-able; that the gross inadequacy of the value of the property and rights sold by said Maloney to the consideration paid by Loftus shocks the conscience and furnishes decisive evidence of fraud." And the bill charges that the mental condition at the time, from drink, was brought about by the conduct of said Maloney, with the fraudulent intention to take advan-tage of the same, and thus get the property of Loftus for a mere song; and that said Maloney did obtain said notes and deed by fraud; and that said Maloney came to Newport News and entered into said co-partnership with Loftus with the express design to defraud him out of his property. The bill then sets forth that said Maloney immediately brought suit against said Loftus in the circuit court of Warwick county for $575, a part of the consideration of said contract, which was to be paid cash, and issued his attachment on the property of said Loftus; and that he is about to foreclose the said deed of trust for the payment of the note for $500, which became due August 21st, 1890. And the bill prays that J. M. Maloney and W. J. Nelms, trustee in said deed of trust, be made par-ties defendant thereto, and required to answer the same on oath; that the said deed of trust and the contract, whether written or verbal, upon which said deed is based, may be set aside and annulled; that said J. M. Maloney be enjoined and restrained from disposing of or assigning the notes given by said Loftus, and secured by said deed of trust, and that he be required to deliver up said notes for cancellation; that said Maloney be enjoined from prosecuting his said suit on the

common law side of the circuit court of Warwick county for $575, and the attachment issued in said suit against said Loftus; that the partnership aforesaid be dissolved, and a receiver appointed to take charge of the assets of said firm and settle the indebtedness and partnership business; that all proper accounts be taken; that J. M. Maloney and W. J. Nelms, trustee as aforesaid, be enjoined and restrained from proceeding to foreclose said deed of trust, and for general relief.

The injunction was awarded according to the prayer of the bill, so far as to enjoin and restrain the defendant, J. M. Maloney, from assigning or disposing of the notes executed by the plaintiff, M. W. Loftus, which are secured by the deed of trust dated 21st day of July, 1890, and also restraining said Maloney and Nelms, trustee in said deed, his or their assigns, agents, or attorneys, from proceeding to foreclose said deed of trust, and also enjoining and restraining said Maloney from prosecuting his common law suit and attachment which he had instituted in the circuit court of Warwick county against said Loftus for $575, until the further order of the court.

The defendants, J. M. Maloney and W. J. Nelms, trustee as aforesaid, filed their separate answers to the complainant's bill.

In his answer, the respondent, J. M. Maloney, says: That it is true that some time in the preceding May he came from the state of Pennsylvania, and purchased from the plaintiff a one-half interest in the lot and building used as a bakery, and owned, or partially owned, by said plaintiff; that the plaintiff and respondent then agreed to form a co-partnership between them, each agreeing to put in the sum of $1,350; that respondent put in $1,350, but that said Loftus put in only $1,000. That it is true that said firm then began the erection of a building, which cost in the neighborhood of $1,800—rather more than less than that sum, however; that the said parties par-

tially furnished the house when completed, and put into the store-house a stock of wines, liquors, cigars, &c., which were mainly bought upon credit, amounting, as stated in complainant's bill, to about $1,500.

The respondent further says it is also true that he, on returning from a business trip to Pennsylvania, on or about the 30th day of June, 1890, took up his abode in the said house; but that it is entirely false that respondent, from that time, or at any time, before or after, used any inducements to the complainant to drink ardent spirits, or to keep said complainant drunk; that, so far from doing so, respondent used at all times every moral means in his power to restrain the complainant's appetite for strong drink; and that the respondent did not, within the time mentioned—that is, between the 30th day of June, 1890, and the time of the ensealing and delivery of the deed of trust sought by complainant's bill to be avoided—ever see, or in any way know of, the alleged drunkenness of the complainant, and that from the best of respondent's observation he cannot believe the complainant was drunk within the time mentioned, with a single exception, which was on Sunday—at least two weeks before anything was said about a dissolution of the firm of Loftus & Maloney; and that on an occasion, prior to respondent's said visit to Pennsylvania, he remonstrated with complainant in respect to his drunken condition, but it was taken in very ill part by said complainant; but that upon respondent's return from his said visit he found such marked improvement in the habits of complainant that he was persuaded it was due to what respondent had said before his departure, and that their mutual business was for some time transacted without friction.

And this respondent further says, that in the conduct of the business of the firm he ascertained that there was a large shortage in the bank account of said firm, occasioned, as respondent afterwards ascertained, by the complainant having

checked upon that fund to pay his individual debts; that the unpleasantness thereby occasioned was in a manner obviated by the promise on the part of the complainant that his fault should not be repeated. But from that time, says the respondent, the conduct of the complainant towards him was annoying and irritating to the last degree; and that the reason of respondent's going to complainant and telling him that the partnership, until then existing between them, must be dissolved, was the result of a combination of ever-recurring little things, rather than that of a single proximate cause. That the only time anything was ever said by this respondent to the complainant in reference to the dissolution of the firm was at the time when the final offer of the complainant was made— the first offer and the final offer of said complainant being made in the same conversation, at the same place, and on the same day; and that, in so far as the allegations contained in the bill point to a conclusion other than this, they are false and misleading. That the conversation, which was very short, was, in effect, this: "I told Mr. Loftus that one or the other of us must get out of the firm; whereupon he offered me, for my interest in the business, the amount put into the firm by me at the outset. I refused his offer, being persuaded that it was inadequate, when, with no intermediate offer, he offered me double what I put into the firm, and offered to assume all the debts of the firm. Your respondent, to that offer, replied, ' I. accept.' The complainant rejoined: ' I am very much obliged to you, sir. I have made some money out of you this morning.' " And respondent says he is certain that at this time the complainant was absolutely sober. That immediately upon respondent's signifying his acceptance of complainant's offer, he (the said complainant) locked the books of the firm in the safe, and assumed control of said business; that the complainant, however, refused to settle with respondent, as he should have done, and it was only after respondent sent his attorney

to complainant that the latter would agree to qualify his almost violent holding of possession by any arrangement to pay the amount becoming due by said sale ; that there was at least five hours consumed in the preparation of the necessary legal instruments, and that, after the papers were so prepared and ready for signature, respondent and complainant, with the attorneys of both parties, met at the office of R. G. Bickford, in the town of Newport News, when the papers were read, and the same, proving satisfactory, were signed by the parties; that the complainant, during this time, was not only not drunk, but his appearance did not indicate that he had been drinking at all; that when the sale was concluded, and the necessary papers signed, respondent, trusting to the honesty of the complainant to make the first payment, as he had agreed to do, handed the complainant a roll of money, aggregating considerably over one hundred dollars, which had come into respondent's hands in the course of the firm's business; but, after several days had elapsed, the complainant still neglecting to make said payment, and by his manner and course of action exciting respondent's suspicion as to the complainant's honest intentions in the premises, respondent brought his said action at law for the recovery of said first payment, from the prosecuting of which action he has been enjoined.

Respondent further says that while it is true that the firm of Loftus & Maloney had but recently started in business, and that the property in question is in the vicinity of six other bar-rooms, yet there is a special advantage in the location of said property for the business in which said firm was, and the said Loftus is now, engaged, it being situated on the only street in Newport News proper where licenses are granted for conducting such business; that it is also true that respondent, after securing the deed of trust aforesaid, left the house formerly occupied by Loftus & Maloney, but that it is utterly false that he removed therefrom any property which had

belonged to said firm; and that, while it may be true, as alleged in the bill, that the stock in the said store-house was, at the time of the filing of the said bill, worth only about $500, yet respondent knows that it was worth, at the time of the dissolution of said firm, certainly not less than $1,500. And respondent expressly says that he has never drawn one penny of the funds of the firm on his individual account, nor has he ever profited by the existence of said firm in any way.

And respondent denies that said contract of sale was unconscionable, the lot having appreciated in value, while in the hands of said firm, at least $500, and, from its peculiar advantages of location, the property would readily command a rental of $75 per month, which, leaving out of question the stock and choses in action assigned, would return a matter of 15 per cent. yearly on the purchase, and that this estimate of rental value is based upon the rents actually paid by parties in the same business adjoining the property in question on both sides.

And respondent utterly and entirely denies that he ever in any way persuaded or induced the complainant to drink, and denies that the mental condition of said complainant at the time of said sale was in any way other than normal. And respondent expressly avers that to all appearances the complainant, at the time of said sale, was possessed of an agreeing mind, and in every way qualified to make a reasonable and sensible bargain. And this respondent "expressly, and with all force and earnestness, avers that, in the transaction of all business at any time had with said complainant, he has acted in all respects as an honorable man should act, and with an utter absence of any intent to defraud or over-reach, and that his conduct is free from any taint of fraud, dishonesty, and irregularity of any kind whatever; that he is amazed at the averments in the complainant's bill, having never before believed that any sentient human being would so pervert, mis-state, and falsify the truth."

The defendant, W. J. Nelms, the trustee in the deed of trust aforesaid, and who was the counsel of the complainant, Loftus, and was present and assisted in the preparation of the papers evidencing the contract of sale between Maloney and Loftus, in his answer says " that he knew nothing of the relations between James Maloney and Matthew W. Loftus prior to their removing to Newport News; that he knew nothing of the formation of the partnership existing between the said parties, except the statement that they had formed a co-partnership. He knows nothing as to the capital which each contributed to the business, nor does he know anything of the manner in which the stock of goods was bought. This respondent does not know whether or not the said Maloney was acquainted with the habits of the said Loftus prior to his entering into the co-partnership with him, nor does he know anything as to the said Maloney using all inducements on his part to get the said Loftus to drink ardent spirits, and to keep him drunk; nor does he know anything about the conversation which occurred relative to a dissolution of the co-partnership, nor anything in regard to the said Maloney keeping the said Loftus under the influence of ardent spirits, or irritating, or annoying and exciting him, until he was deprived of his reason and of an agreeing mind. He knew nothing of the arrangements between the said Loftus and Maloney in regard to the dissolution of partnership until Mr. Loftus approached him and requested that he should draw the papers necessary for the dissolution, saying that they had dissolved, and mentioning the terms of the dissolution of said co-partnership. At the time this conversation occurred, in the respondent's office, this respondent believed the said M. W. Loftus to be of sound and agreeing mind, and did not notice any peculiarities, nor did he notice or observe that he had been drinking at all. Certainly this respondent would not have drawn any papers affecting his client's interest had he for one moment thought

or believed him of other than a sound and agreeing mind, and perfectly capable of the arrangement or arrangements affecting his property. This respondent does not know whether the price paid for the property was excessive or not. The only special advantage, if any, that this location has over any other is that it is in that part of Newport News where the county court will grant licenses for the sale of liquors, and where there seems to be no objection on the part of the citizens, which is not the case in any other part of the town lying west of the railroad track."

And this respondent further says " it is true that the bar is in the vicinity of six other bar-rooms. This respondent knows nothing of the defendant, James Maloney, leaving the house, or taking with him any of the personal property, nor the collecting of any outstanding debts by the said Maloney, nor of his statements in regard to returning to the house and owning it; nor the value of the stock of goods in the said bar-room at the present time, nor at the time the complainant filed his bill. This respondent knows nothing of the fraudulent intentions of the said James M. Maloney, or any attempt to take any advantage of the said Loftus, or to obtain his property for a mere song. He was advised shortly after the institution of thé suit by Maloney, but he knows nothing of any effort to foreclose a deed of trust. He was never requested to sell the property conveyed to him as trustee. And now, having fully answered, &c., this respondent prays," &c.

The injunction having been awarded according to the prayer of the bill, and the defendants having answered, depositions were taken by both parties, and, the cause having been matured, the same was removed from the circuit court of Warwick county to the corporation court of the city of Norfolk, where, on the 23d day of June, 1891, a decree was entered dissolving the injunction theretofore awarded, and dismissing the complainant's bill. And from that decree the case is here on appeal.

*M. T. Hughes*, for appellant.

*R. G. Bickford*, for appellee.

RICHARDSON, J., (after stating the case,) delivered the opinion of the court.

It is quite clear that the decree complained of is entirely without error.

The bill directly charges that the defendant, Maloney, (appellee here,) came to Newport News with a view of procuring the partnership with the complainant, Loftus, (appellant here,) and to cheat and defraud said Loftus out of his property for a mere song; and that, having secured the partnership, Maloney, by every means in his power, persuaded and induced his partner, Loftus, to drink ardent spirits, for two or three weeks, to such excess as to deprive him of an agreeing mind, and to render him, in effect, *non compos mentis* and utterly incapable of protecting his interests; and that in this condition he was induced by Maloney to become the purchaser of his interest in said firm of Loftus & Maloney at an exorbitant and unconscionable price. These charges are repeated time and again in the bill, and with alleged circumstances of aggravation which, if true, would render the appellee a very demon and the author of a fraud the enormity of which is rarely, if ever, surpassed. But, in his answer, the appellee, Maloney, with circumstantial particularity responds to each and every form of the charge, and indignantly denies and repels the charge in each and every form in which it is imputed to him. Not only does he do this, but he goes on to present in minute detail all the circumstances connected with the formation of the partnership, the conduct of the firm's business, and the circumstances which made it incumbent upon him to demand a dissolution of the co-partnership; and

he most positively disclaims having ever observed or known of the alleged drunkenness of the appellant for two or three weeks next preceding the contract in question, or that he ever, within the time specified, knew him to be drunk, except on one occasion, which was on a Sunday, some weeks prior to the contract, for which he remonstrated with him ; and he most positively denies that he ever in any way induced the appellant to drink ardent spirits, with the view of taking advantage of his inebriety or in any way overreaching him; and he positively avers that the terms of dissolution were proposed by the appellant, and were accepted by him, and that the appellant was at the time absolutely sober.

Then comes the sworn answer of W. J. Nelms, trustee in the deed of trust, and the specially-employed and trusted counsel of the appellant to prepare the necessary papers for the completion of the contract, who says: That he knew nothing of the arrangements between Loftus and Maloney in regard to the dissolution of the partnership until Loftus approached him and requested that he should draw the necessary papers, saying they had dissolved, and mentioning the terms of the dissolution ; that at the time this conversation occurred, in the respondent's office, this respondent believed Loftus to be of sound and agreeing mind, and did not notice any peculiarities, nor did he notice or observe that Loftus had been drinking at all, and that certainly respondent would not have drawn any papers affecting his client's interest had he for one moment thought or believed him of other than a sound and agreeing mind, and perfectly capable of making the arrangement affecting his property.

These important averments in the answers of the two defendants are in response to the demand in the bill that they be required to answer under oath. Viewed, then, in the light of the bill and answers, the averments in the latter being necessarily called forth by the bill, the case is unmistakably and

overwhelmingly with the appellee. And now, in turning to the evidence, we shall see that the appellee's case, so far from being weakened thereby, is decidedly strengthened.

The plaintiff below (the appellant here) introduced four witnesses, Fowler Hamilton, Thomas McLaughlin, C. E. Talmadge, and E. G. Wells.

Fowler Hamilton, after the usual preliminary questions, is asked: " Ques. Did you often see M. W. Loftus for several weeks prior to the 21st day of July, 1890 ? Ans. Yes, sir. Ques. State whether or not said Loftus was drinking to excess during the two or three weeks prior to 21st day of July, 1890 ? Ans. I think he was. Ques. Did you see, during that time, J. M. Maloney serve drinks to said Loftus whilst said Loftus was under the influence of liquor? Ans. I think I have. Ques. State whether or not, in your opinion, the said Loftus was capable of understanding the nature of any important contract on the 21st day of July, 1890 ? Ans. I did not see him that day. Before that he had been drinking for two or three weeks, and I did not think he was, hardly. Ques. When was the last time, prior to the said 21st day of July, that you saw M. W. Loftus? Ans. I couldn't say exactly. It was a day or two before the 21st that I saw him. I generally went home on Friday or Saturday. I know it was two or three days from the time I went home until I came back, when Mr. Maloney told me he had sold out. Ques. Was Loftus drunk when you went home ? Ans. I did not see him when I first went there. I saw him later on the same day— that is, the day I came back. I think it was the next day, or the second day, I saw him. Ques. What was the condition of Loftus when you went home, and what had been his condition for two or three weeks prior to the sale on the 21st day of July, 1890 ? Ans. He had been drinking quite some for two or three weeks before the 21st day of July, 1890. Ques. State whether or not, in your opinion, the mind of said Loftus

was so impaired and weakened on the 21st day of July, 1890, from continuous previous intoxication, as to render him incapable of fully understanding the nature of an important contract? Ans. I don't think hardly he was fit for business in the shape he had been in. Ques. Did you see Loftus on the 21st day of July, 1890, or any time soon thereafter; and, if so, state whether or not he was under the influence of liquor then? Ans. I think I saw him certainly within two days thereafter. He was not in good shape then; had been drinking. Ques. Would you have been willing to enter into any important contract with said Loftus for two weeks before he bought out Maloney? Ans. I don't know as I would; don't think I would. Ques. Why would you not? Ans. I don't think he was capable of doing business, on account of his drinking."

On cross-examination, this witness was asked: "Ques. Do you think, from what you know of Mr. Maloney, that he is the kind of man to make another drink, and then take advantage of his condition to cheat him? Ans. No, sir; I never judged him that way."

In answer to other questions, this witness (Hamilton) deposes that the appellant, Loftus, had been drinking heavily for a week or two prior to the transaction in question, and that during that time he did not consider him capable of understanding the nature of any important transaction; that he never knew the appellee, Maloney, to encourage the appellant, Loftus, to drink; and that the last time he saw Loftus before the transaction in question was some two days previous thereto, and did not see him again until some two days subsequent to the consummation of the contract.

Surely there is nothing in all this that reasonably tends to support the charge in the bill that the appellee induced the appellant to drink and be drunk, and that the latter was, at the time of this transaction, drunk, and his mind so impaired by his then and previous continuous drunkenness that he was

incapable of understanding the nature of the transaction in question.

Thomas McLaughlin, another witness for the appellant, deposes as follows : " Ques. State whether or not you saw M. W. Loftus at any short time previous to the 21st day of July, 1890, and, if so, when, and what was his condition—whether sober or intoxicated—when you saw him ? Ans. I was there within three days prior to the dissolution of co-partnership of Loftus & Maloney. It might have been two days. I am certain it was within three days. Mr. Loftus was not then drunk, but was intoxicated. Ques. How often did you see Loftus the two weeks just previous to the dissolution of partnership ? Ans. Most every day. Ques. What was his general condition during that time as to soberness ? Ans. He was not sober, nor beastly drunk—what you might call helplessly drunk ; some time he was not sober. Ques. In your opinion, was or not his mind at that time too much impaired from drink to enable him to enter into an important contract understandingly ? Ans. The last time I saw him, three days previous to the dissolution, his mind was not in any condition to make a contract, but his mind might have been all right when the contract was made."

This is the entire deposition of the witness, Thomas McLaughlin. He, like the preceding witness, Hamilton, proves nothing to the purpose. He last saw Loftus three days prior to the transaction in question, and does not pretend to know anything of his condition three days later, when the contract was consummated, but he says his mind might have been all right *when the contract was made.*

Another witness, O. E. Talmadge, was introduced on behalf of the appellant, Loftus, and he deposes : " Ques. Did you or not see M. W. Loftus frequently for the two weeks prior to the 21st day of July, 1890, or before the dissolution of the partnership of Loftus & Maloney ? Ans. Yes. Ques.

State whether or not Mr. Loftus was drinking to excess during those two weeks? Ans. I think he was. Ques. State whether or not, in your opinion, his mind was so impaired and weakened from drink as to render him, on the 21st day of July last, or the dissolution of the partnership, incapable of fully understanding the nature of an important contract? Ans. I know he was quite full of liquor at night. I did not see him in the day. I don't know; it is quite a hard thing to say. I am quite sure the old gentleman was drinking quite hard. I did not know of any trouble between him and Mr. Maloney at that time; it was none of my business. Ques. Did you consider Mr. Loftus to be in such a frame of mind as to enable him to transact important business at that time, or on the 21st day of July, or for several days prior? Ans. I know during that time that I considered him sober. Ques. Was he, on the 21st day of July, 1890, the day of the dissolution of the partnership, or for several days previous, in such a frame of mind as to render him capable of entering voluntarily into an important contract? Ans. Well, I don't know about that. I couldn't tell what the man thought, or what he was thinking about."

After these confused and contradictory statements, this witness goes on to say that, from what he saw of Loftus, he would not have trusted him to transact important business for him (witness), and that he (witness) would not have entered into any important contract with Loftus on or about the day of the dissolution of the partnership of Loftus & Maloney. The witness was then asked: " Ques. State whether, in your opinion, Mr. Loftus had been in the same frame of mind—that is, incapable of attending to important business—for several days prior to the night you have spoken of? Ans. In my opinion, he was not." This last answer clearly means, if anything, that Loftus, on the 21st of July, 1890, the day of the contract, and for several days prior thereto, was not

incapable of attending to important business, he having previously stated that on said 21st day of July, and for several days prior thereto, he considered Loftus sober.

On cross-examination this witness admits that he does not remember the day of the week on which the dissolution of the co-partnership of Loftus & Maloney occurred. Yet, in answer to the question, " Are you absolutely sure that you saw Loftus on the night preceding the dissolution ? " he answered : " Yes ; I was there, and drank with him." Now, it is conceded on all hands that the contract and dissolution was consummated on Monday, the 21st of July, 1890 ; hence the preceding night was Sunday night of the 20th of July. But the witness, a little later, was asked : " Were you in the bar the Sunday preceding the dissolution ; and, if so, were you there in the evening, and how long did you stay, if you were there ? Ans. I don't remember of being in there that Sunday. Ques. Was Mr. Loftus drunk on the Sunday preceding the dissolution, or do you fail to remember ? Ans. I don't remember." And here the deposition of this witness ends ; and it proves, if anything, much more against than for the appellant, Loftus. It proves that on the 21st of July, 1890, the day of the contract, and for several days prior thereto, Loftus was *sober*, and capable of attending to business.

The only other witness who was examined on behalf of the plaintiff, Loftus, (appellant here,) was E. G. Wells. This witness manifests towards the appellee, Maloney, a rancor evincing spite, if not deep-seated hate. This is manifest from his answers to the two most important questions propounded to him—one on his examination-in-chief and the other on his cross-examination. On his examination-in-chief, after the usual preliminary questions, he was asked : " Did you see M. W. Loftus frequently for a week or two prior to the 21st day of July, 1890—the day Maloney sold out to Loftus ; and, if so, state

whether or not he (Loftus) had been drinking to excess at that time? Ans. I did; and considered him (Loftus) a complete imbecile. I don't think he was competent to take charge of anything." And on his cross-examination he was asked: "Do you regard Mr. Maloney as a man who would make another drunk, and then cheat or swindle him? Ans. I'll tell you. I think that Loftus was completely under the influence of liquor, and that he was cheated, and that Mr. Maloney was not too good a man to do it. That is my evidence, and you can make the best of it." In other respects the statements of this witness are as indefinite, inconsistent, and unintelligible as those of the other witnesses on behalf of the appellant, Loftus. This witness (Wells) having stated, as above set forth, that he considered Loftus a complete imbecile, &c., was examined further, as follows: "Ques. What caused this state of mind in Mr. Loftus? Ans. Drink, as far as I could ascertain. That is the effect it has on me—that is, no man, while drinking to excess, can attend to business. Ques. Did you, during the above-mentioned time, see Maloney serve drinks to Loftus? Ans. I saw him on one occasion give him a drink. McKey and myself carried him to his room on Sunday, and he laid there all day as if he was dead. Ques. State whether or not the Sunday you speak of was about the time the said sale was made? Ans. It was Saturday, the 19th, they separated. It was somewhere in that locality. I stayed one week after they were separated. Ques. You say it was somewhere in that locality. Do you mean by that answer to say it was the Sunday following the 19th? Ans. It was somewhere about that immediate time. I couldn't state exactly the day. Ques. Did you see Loftus every day about that time, or for several weeks prior to that time? Ans. I saw him pretty nearly every day I was in the house. Mr. Maloney generally had charge of the bar. Loftus was not in a condition to take charge of anything."

Such is the entire evidence-in-chief of the witness Wells. Now, observe the witness had stated positively that on one occasion he saw Maloney give Loftus a drink, and that McKey and witness carried Loftus to his room on Sunday, &c.; but he did not state what Sunday it was. Hence it became necessary to settle the matter by showing that it was the Sunday next preceding the day of the contract, and to that end the witness was asked " whether or not the Sunday spoken of was about the time the said sale was made "; but the witness answered positively : " It was Saturday, the 19th, they separated "—meaning that it was on that day that the partnership of Loftus & Maloney was dissolved. This threatened to overturn the whole theory of alleged drunkenness and incapacity of Loftus on the day of the contract, and for several days prior thereto, for no other witness mentions any occasion on which Loftus was absolutely drunk; and if, as this witness had said, the dissolution occurred on Saturday, the 19th of July, that Loftus was then, and for several days previous, drunk and incapable of attending to business, then the drunkenness referred to, if previous to Saturday, the 19th, must have been on Sunday, the 13th of July, or on some Sunday previous thereto, and thus too far in advance of the date of the dissolution of the partnership to make it an efficient factor in giving color to the alleged drunkenness on the day the contract was consummated, and for some days prior thereto ; and if, on the other hand, the Sunday's drunkenness referred to occurred on the day succeeding the transaction in question, or on any subsequent Sunday, then, being after the contract was completed, it was wholly immaterial. In this dilemma the question was, in a more direct form, repeated, and the witness pressed to state whether, by his previous answer, he meant to say it was the Sunday following the 19th ; and the witness was so far accommodating as to answer : " It was somewhere about that immediate time. I couldn't state

exactly the day." Yet this witness, on his cross-examination, makes the following answers to questions put to him : " Ques. You recognize the difficulty of remembering what took place so long ago, and do not attempt to locate the day exactly ? Ans. I have the day of separation on an envelope. It was on the 19th of July. Ques. You are absolutely certain that the separation took place on this day, are you ? Ans. Yes, sir." So at last this witness (Wells), if he proves anything, proves that the total drunkenness of Loftus referred to by him occurred on the Sunday succeeding the day of the contract, and has, therefore, no bearing whatever on the question involved.

This is all the evidence offered by the plaintiff below (the appellant here) to sustain the allegations of the bill that the defendant, Maloney, (the appellee here,) induced and persuaded the appellant, Loftus, to drink to excess, and to be drunk and incapable of understanding the nature of an important contract, and that the appellant was, at the instance and by the inducement of the appellee, drunk, and his mind so impaired by drink, at the time of entering into the contract here in question, that he did not enter into it understandingly, and that therefore the contract should be rescinded, the trust deed executed by the appellant to W. J. Nelms, trustee, to secure to said appellee the payment of the purchase-money notes therein mentioned, should be annulled, and that the appellee should be perpetually enjoined from collecting said purchase-money.

In turning now to the evidence on behalf of the appellee, it will be seen, not only that the appellant signally failed to make good the charges in his bill, but that the appellee, by an overwhelming array of uncontradicted and highly-satisfactory evidence, actually disproves every material allegation and charge contained in the bill.

The principal defendant, Maloney, as well as W. J. Nelms,

trustee in said deed, were called upon in the bill for answers under oath.   In his answer the appellee, Maloney, indignantly denies all fraud, over-reaching, or unfair dealing in any way. He sets forth in detail and at large all the circumstances leading up to the dissolution of the firm of Loftus & Maloney. He says it is entirely false that he at any time used any in-ducements to Loftus to drink ardent spirits, or to keep him drunk; that, so far from doing so, he at all times used every moral means in his power to restrain his appetite for strong drink; that from the 30th day of June, 1890, when he re-turned from a visit to Pennsylvania, to the time of the dissolu-tion of the firm of Loftus & Maloney, he (Maloney) never saw, or in any way knew of, the alleged drunkenness of Loftus, and that from the best of his observation he cannot believe that Loftus was drunk within the time mentioned, · with a single exception, which was on Sunday, at least two weeks before anything was said about a dissolution of the firm; that on an occasion prior to respondent's said visit to Pennsylvania, in a certain bar-room in the town of Newport News, respondent remonstrated with Loftus in reference to his drunken condition, which was taken in very ill part by Loftus, but that on his return from his said visit he found such marked improvement in the habits of said Loftus that he (respondent) was persuaded that it was due to what he had said before his departure, and that their mutual business was for some time transacted without friction.

The respondent, Maloney, then proceeds to say that, in the conduct of the business of the firm, he ascertained that there was a large shortage in the bank account of the firm, occasioned, as he afterwards ascertained, by Loftus having checked upon the fund to pay his individual accounts; that the unpleasant-ness thus occasioned was in a manner obviated by the promise on the part of said Loftus that his fault should not be repeated, but that from that time the conduct of said Loftus towards

respondent was annoying and irritating to the last degree, and that the reason of respondent's going to Loftus and telling him that the partnership, until then existing between them, must be dissolved, was the result of a combination of ever-recurring little things, rather than that of a single proximate cause.

And the respondent further says that the only time anything was ever said by him to Loftus in reference to the dissolution of the firm was at the time when the final offer of said Loftus was made—his first and final offer being made in the same conversation, at the same place, on the same day; and that, in so far as the allegations in the bill point to a different conclusion, they are false and misleading. That the conversation—a very short one—was, in effect, this: " I told Mr. Loftus that one or the other of us must get out of the firm; whereupon he offered me, for my interest in the business, the amount which I put into the firm in the outset. I refused his offer, being persuaded that it was inadequate, when, with no intermediate offer, he offered me double what I put into the firm, and offered to assume all the debts of the firm." That to that offer respondent replied, " I accept." That Loftus rejoined : " I am very much obliged to you, sir. I have made some money out of you this morning." And this respondent says he is certain that at this time Loftus was absolutely sober, and that, immediately upon respondent's signification of his acceptance of the offer, Loftus locked the books of the firm in the safe, and assumed control of the business; that Loftus refused, however, to settle with respondent, as he should have done, and that it was only after respondent sent his attorney to Loftus that the latter agreed to arrange for the payment of the sum becoming due to respondent on account of the sale of his interest in said firm to said Loftus; that at least five hours were consumed in the preparation of the necessary papers, and that, when the same were prepared and ready for signature, respondent and Loftus, with their respective attorneys,

met at the office of R. G. Bickford, in the town of Newport News, where the papers were read, and the same, proving satisfactory, were signed by the parties, and that Loftus, during this time, was not only not drunk, but his appearance did not indicate that he had been drinking at all; that when the sale was concluded, and the papers signed, respondent, trusting to the honesty of Loftus to make the first payment, as he had agreed to do, handed him a roll of money, aggrégating considerably over one hundred dollars, which had come into respondent's hands in the course of the firm's business, but that, after the lapse of several days, Loftus still neglecting to pay the amount, and by his manner and course of action exciting respondent's suspicions as to the honest intentions of Loftus in the premises, he (respondent) instituted his said action at law for the recovery of said sum, from proceeding in which, at the instance of said Loftus, the respondent has been enjoined.

And the respondent denies that said contract of sale was unconscionable, and says that the lot upon which said business was conducted has increased in value at least five hundred dollars since its purchase, and while in the hands of said firm, and that, from its peculiar advantages of location, the property would readily command a rental of $75 per month, which, leaving out of question the stock and choses in action assigned, would yield a matter of 15 per cent. yearly on said purchase. And respondent utterly and entirely denies that he ever in any way persuaded or induced said Loftus to drink; denies, further, that the mental condition of said Loftus at the time of sale was in any way other than normal, and expressly avers that to all appearances the said Loftus, at the time of the sale, was possessed of an agreeing mind, and in every way qualified to make a reasonable and sensible bargain.

And he further says: " Your respondent expressly, and with all force and earnestness, avers that, in the transaction of all

business at any time had with said Loftus, he has acted in all respects as an honorable man should do, and with an entire absence of any intent to defraud or over-reach, and that his conduct is free from any taint of fraud, dishonesty, or irregularity of any kind whatsoever. Your respondent is amazed at the averments in the complainant's bill, having never believed until now that any sentient human being would so pervert, mis-state, and falsify the truth."

This answer is directly responsive to the bill, and it directly and specifically denies every material allegation therein contained. It is a proposition too long and well established to need either argument or the citation of authorities to sustain it, that to overcome the effect of such an answer requires two witnesses, or one witness and strong corroborating circumstances. It has already been shown, not only that no two witnesses sustain the material allegations in the bill, but that such allegations are not sustained by any one witness; and, as to the surrounding circumstances, they all stand opposed to the bill. It follows, therefore, that, upon the bill and the evidence adduced in support thereof, and the answer of the appellee, Maloney, the case is clearly with said appellee.

But the appellee does not rest his case alone upon this state of facts. On the contrary, there is a mass of clear, cogent, and uncontradicted testimony, fully sustaining the answer of the appellee, Maloney, in its denial of the principal averments of the bill.

The defendant, W. J. Nelms, trustee as aforesaid, who, as counsel for the appellant, Loftus, was present at the execution of the contract, says " he knew nothing of the arrangements between the said Loftus and Maloney in regard to the dissolution of partnership until Mr. Loftus approached him and requested that he should draw the papers necessary for the dissolution; saying that they had dissolved, and mentioning the terms of the dissolution of said co-partnership; that at the

time this conversation occurred, in respondent's office, this respondent believed the said M. W. Loftus to be of sound and agreeing mind, and did not notice any peculiarities, nor did he notice or observe that he had been drinking at all. Certainly this respondent would not have drawn any papers affecting his client's interest had he for one moment thought or believed him of other than a sound and agreeing mind, and perfectly capable of the arrangement or arrangements affecting his property."

R. G. Bickford, a witness for the defense, was, as the counsel of the appellee, Maloney, also present at the execution of the contract. He says: "I am attorney for the defense in this case. My first knowledge of the case dates from the morning of the 21st of July, 1890, at which time Mr. James M. Maloney, the defendant in this case, came to my office and asked me to see Mr. Matthew Loftus, the plaintiff, in relation to a sale which had just been arranged between them. In consonance with this wish, I went to the business house of Loftus & Maloney, where I met Mr. Loftus. I told him that Mr. Maloney had told me that they had agreed to dissolve the co-partnership formerly existing between them, and that he (Loftus) had become the purchaser of Maloney's interest in the firm, paying him a certain sum therefor, and agreeing to assume all the debts of the former firm. Mr. Loftus said : ' Yes, I agreed to pay him double what he put in, and assume all the debts of the firm.' He said further: ' I regarded my offer and his acceptance as a sale, and consequently took, and still hold, possession of the property.' At this time I am certain that Mr. Loftus was sober. He added, further, that he was ready to execute the proper papers at any time. I asked him what time would suit him, and he said, ' As soon as I can see my attorney.' The preparation of the papers and arrangements as to payments consumed at least five hours. When they were at last prepared Mr. Loftus and his attorney, Mr.

Nelms, came into my office, meeting there Mr. Maloney and myself. Quite a little time was then consumed in reading the papers to both parties, when, after the reading, the papers were signed. Mr. Loftus, in the conversation held in my office, said that he would in two or three days pay the sum of, five hundred dollars, which was due as cash payment on the sale, as well as the sum of seventy-five dollars, which he acknowledged to be due Mr. Maloney on another matter. I approached him several days later in regard to the sum so agreed to be paid, and, in refusing to pay, his manner was of so doubtful a character as to raise my suspicions, whereupon I entered suit upon the amount, from the prosecution of which my client has been enjoined. Throughout the whole conduct of my business with Mr. Loftus in this regard I did not see anything that looked like, or in any way savored of, drunkenness, or any mental failing whatsoever."

It is proved by the uncontradicted testimony of two witnesses for the defense, John Enright and John Lowery, that on Sunday, the 20th of July, 1890, the day preceding the contract, that there was a meeting of the Catholics of Newport News, at which mass was celebrated, and that after mass a meeting was held to raise funds with which to erect a Catholic church in said town ; that the appellant, Loftus, was present at the celebration of mass, and also at the meeting to raise funds for a church building ; that he was quiet and orderly, and did nothing to indicate intoxication or imbecility, and that he was offered the office of collector of the fund to be raised, but declined it.

To C. F. Hobson, another witness for the defense, the appellant, Loftus, in the afternoon of the day of the execution of the contract, spoke exultingly of the purchase by him of the interest of Maloney in the firm of Loftus & Maloney ; and the witness says that Loftus seemed to be pleased at the bargain he had made, and asked witness to take a drink on it,.

and that he was not drunk. And, in answer to the question, on cross-examination, " Has not Mr. Loftus been a very dissipated man since you have known him ? " answered : " He has not. He takes his regular drinks every day, as far as I have seen him. The old man boarded with me for about six months—commencing the preceding October—and I have never seen him so he could not attend to his business yet."

W. H. Webber, another witness for the defense, deposes that he saw Loftus on the morning of the 21st of July, when the sale of Maloney's interest in the firm of Loftus & Maloney was made to Loftus, and that " he was sober and all right ; that he saw Loftus a number of times during the day ; that he was sober, and attending to his business ; that he never saw Maloney urge or encourage Loftus to drink, and that witness was at the house of Loftus & Maloney from Friday evening previous to the transaction until the succeeding Tuesday, and that Loftus was sober during that time."

In the face of this unbroken current of testimony, it is worse than idle—it is absurd and ridiculous in the extreme—to claim that the contract sought to be rescinded and annulled was entered into by the appellant, Loftus, when he was drunk and his mind so impaired that he did not know what he was doing, and that such drunkenness and impairment of intellect was induced and procured by the appellee, Maloney, with the fraudulent purpose of getting the appellant's property for a mere song. No witness testifies to any fact, nor does any circumstance disclosed by the record tend reasonably to any such conclusion.

The law touching intoxication as a defense to contracts is clearly and succinctly stated in 11th Am. and Eng. Ency. of Law, p. 773, where it is said : " An express contract, entered into when the obligor is in a state of intoxication, so as to deprive him of the exercise of his understanding, is voidable ; and the party may, for that cause, avoid it, although the in-

toxication was voluntary, and not procured through the circumvention of the other party." And in a note it is said : " To render the transaction voidable, he who sets up intoxication as a defense should have been so drunk as to have drowned reason, memory, and judgment, and impaired his mental faculties to an extent that would render him *non compos mentis* for the time being, especially where there is no pretense that any person connected with the transaction aided in or procured his drunkenness "—citing *Bates* v. *Ball*, 72 Ill. 108; *Birdsong* v. *Birdsong*, 2 Head. (Tenn.) 289. It is not alone the influence of liquor which avoids a contract, but it must be shown to exist to such an extent as to seriously impair the reasoning faculties. *Hickett* v. *Sutter*, 5 Cal. 412; *Cavendor* v. *Waddingham*, 5 Mo. App. 457. At the time of making the contract the party seeking to avoid it must have been in such a state of drunkenness as not to know what he was doing. *Johns* v. *Fretchey*, 39 Md. 258.

The doctrine of these decisions rests upon the natural, plain, and true ground that the contract of a party *non compos mentis* is without the essential element of an agreeing mind, and is voidable merely at his option, and capable of ratification by the intoxicated party on becoming sober. And it cannot be impeached by third persons so long as the party who was intoxicated acquiesces, but it may be avoided by his legal representatives. *Wigglesworth* v. *Stears*, 1 Hen. & Munf. 70.

But it is useless to discuss the principles applicable to intoxication as a defense to contracts where, as in the present case, the alleged drunkenness is not only not sustained by proof, but is actually proved not to have existed—the, to say the least, overwhelming weight of testimony being that the appellant was not, at the time of the contract, drunk and incapable of knowing what he was doing, but was sober, and his mental faculties in no way impaired.

It is contended, on behalf of the appellant, that the con-

tract was unconscionable. In answer to this it is only neces-
sary to say that the uncontradicted testimony is that the
property in question would yield from 12 to 22 per cent.
annually in rent. An investment capable of yielding such a
return cannot possibly be considered the result of an uncon-
scionable bargain.

It is also contended that the court below erred in not
directing an issue out of chancery to be tried by a jury. In
the light of the testimony there was no occasion for such an
issue, and the trial court would have been guilty of gross error
had it directed an issue, the evidence being clear and decisive
in favor of the defendant (the appellee here), and the object
of such an issue being to aid and satisfy the conscience of the
chancellor, where the evidence is, as to the fact to be determined,
so conflicting as to make it doubtful what the decision should
be. Hence, in *Harding* v. *Handy*, 11 Wheat. 103, Chief
Justice Marshall said: "There seems to be, ordinarily, no
reason for the intervention of a jury to try an issue of fact in
a chancery cause, unless the court would be satisfied with the
verdict, however it might be found." See, also, *Beverly* v.
*Walden*, 20 Gratt. 154, where it is said "that when the alle-
gations of the bill are positively denied by the answer, and
the plaintiff has failed to furnish two witnesses, or one witness
and strong corroborating circumstances, in support of the bill,
it is error in the chancellor to order an issue."

For the reasons above stated it is entirely clear—1st, that
the appellant, Loftus, was not drunk or otherwise incapacitated
at the time of the execution of the contract; 2d, that the con-
tract was entered into at the instance of Loftus, and that no
undue or improper conduct is imputable to Maloney; 3d, the
bargain was not unconscionable. It follows, therefore, that
the decision of the court below is clearly right, and must be
affirmed.

DECREE AFFIRMED.